UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | * | |
| | * | |
| v. | * | Criminal No. 1:19-cr-10163-IT-3 |
| | * | |
| STEVEN MIRANDA, | * | |
| | * | |
| Defendant. | * | |

MEMORANDUM & ORDER

May 11, 2020

TALWANI, D.J.

Defendant Steven Miranda was charged with a single count of conspiracy to distribute and to possess with the intent to distribute certain controlled substances, including 40 grams or more of a mixture and substance containing fentanyl, in violation of 21 U.S.C. § 841(a)(1) and § 846. The indictment alleged further that 40 grams or more of a mixture and substance containing fentanyl was foreseeable by, and attributable to, Defendant such that 21 U.S.C. § 841(b)(1)(B)(vi) is applicable. On Miranda's motion for a judgment of acquittal, the court finds that a reasonable jury could determine beyond a reasonable doubt that Miranda entered into the charged conspiracy but that no reasonable jury could find beyond a reasonable doubt that the conspiracy involved 40 grams or more of a substance containing fentanyl that was attributable to, or reasonably foreseeable by, Miranda. Accordingly, the court grants a partial judgment of acquittal, and otherwise denies the motion.

I.   Procedural History

At the close of the government's evidence, Miranda moved for a judgment of acquittal under Fed. R. Crim. P. 29(a), arguing that no reasonable jury could find that Miranda entered into the charged conspiracy or, alternatively, that no reasonable jury could find that the

conspiracy involved 40 or more grams of fentanyl that was attributable to or reasonably foreseeable by Miranda. The court deferred acting on the motion. Miranda rested without presenting any additional evidence and, subsequently, the jury failed to reach a verdict. The court declared a mistrial and Miranda timely renewed his motion pursuant to Fed. R. Crim. P. 29(c).

II.     Rule 29 Standard

Where the court reserves decision and submits the case to the jury, the court must "decide the motion on the basis of the evidence at the time the ruling was reserved." Fed. R. Crim. P. 29(b). A court must grant the motion as to any offense "for which the evidence is insufficient to sustain a conviction." Fed. R. Crim. P. 29(a). A defendant must show that "the evidence presented at trial, even when viewed in the light most favorable to the government, did not suffice to prove the elements of the offense[] beyond a reasonable doubt." United States v. Acevedo, 882 F.3d 251, 257 (1st Cir. 2018). The court "examine[s] the evidence – direct and circumstantial – as well as all plausible inferences drawn therefrom" to determine whether "a rational fact finder could conclude beyond a reasonable doubt that the defendant committed the charged crime." United States v. Wyatt, 561 F.3d 49, 54 (1st Cir. 2009). The court "do[es] not weigh the evidence or make any credibility judgments," United States v. Merlino, 592 F.3d 22, 29 (1st Cir. 2010), but it must also "take a hard look at the record and [reject] those evidentiary interpretations and illations that are unreasonable, unsupportable, or overly speculative." United States v. Spinney, 65 F.3d 231, 234 (1st Cir. 1995).

III.    The Conspiracy Charge

To convict Miranda of conspiracy to distribute or to possess with the intent to distribute in violation of 21 U.S.C. § 841(a)(1) and § 846, the government was required to prove beyond a reasonable doubt 1) that an agreement existed to commit the underlying offense; and 2) that the

"defendant agreed to participate in it, intending to commit the underlying substantive offense." United States v. Sepulveda, 15 F.3d 1161, 1173 (1st Cir. 1993). "An agreement to join a conspiracy 'may be express or tacit . . . and may be proved by direct or circumstantial evidence.'" United States v. Liriano, 761 F.3d 131, 135 (1st Cir. 2014) (quoting United States v. Rivera Calderon, 578 F.3d 78, 88 (1st Cir. 2009)).

"The use of conspiracy doctrine in a vertical context," based on a buyer-seller relationship, "has caused courts unease." United States v. Boidi, 568 F.3d 24, 29 (1st Cir. 2009). "Purchases by an addict or casual user for personal use may not automatically make one a member of a conspiracy to distribute." United States v. Innamorati, 996 F.2d 456, 492 (1st Cir. 1993). Nonetheless, in such vertical relationships, evidence of a continuing purchase and sale relationship between a buyer and seller *and* evidence of the seller's knowledge of the buyer's redistribution of drugs is sufficient to allow a jury to "infer both an agreement between [a buyer and seller] that [the buyer] possess the drugs and the requisite intent as to distribution." Boidi, 568 F.3d at 29-30. See also United States v. Symonevich, 688 F.3d 12, 23-24 (1st Cir. 2012) (noting that evidence seller knew buyer was redistributing drugs was relevant in evaluating conspiracy conviction).

In his motion, Defendant argues the government failed to present sufficient evidence for a reasonable jury to find beyond a reasonable doubt that he joined the charged conspiracy. Def's Mem. in Support of Mot. for Judgment of Acquittal ("Def's Mem.") 3-4 [#186]. At trial, the government presented testimony of law enforcement witnesses, physical evidence seized in Miranda's home when he was arrested on April 25, 2019, and text messages and phone calls between Manuel Pina Agee (aka Manny) and Miranda. The calls and text messages were intercepted in wire taps that were operational between October 31, 2018, and November 21,

2018, and between March 27, 2019, and April 25, 2019. Defendant argues this evidence could establish at most that Miranda purchased drugs from Pina Agee for personal use and that, therefore, there is insufficient evidence to meet the government's burden to prove that Miranda joined Pina Agee's conspiracy, either through redistributing drugs or by connecting new customers to Pina Agee. Id. at 5-8. Alternatively, Defendant argues there is insufficient evidence to support a finding that Pina Agee knew Miranda was redistributing drugs. Id. at 6 ("Their relationship, based upon the evidence presented at trial, was strictly related to Mr. Miranda's personal use or consumption."). The court considers each argument in turn.

    A.  Redistribution

Viewed in the light most favorable to the government, there is sufficient evidence for a reasonable jury to find beyond a reasonable doubt that Miranda redistributed drugs that he purchased from Pina Agee. On April 25, 2019, law enforcement executed a search warrant at Miranda's house. They seized two plastic bags containing a total of ten grams of fentanyl from the pocket of Miranda's red jacket. Trial Exhibit ("Ex.") 58 (photo of jacket); Ex. 59 (photo of bags in red jacket pocket). Officers also found in Miranda's bedroom two digital pocket scales, a grinder, a small container with trace amounts of fentanyl, dozens of plastic baggies, many of which had corners cut off, and $500. Ex. 64 (plastic baggies); Ex. 65 (photo of electronic scales and grinder); Ex. 66 (photo of fentanyl residue in container). Detective Charles Mello, who participated in the search and Miranda's arrest, testified that, based on his experience with past narcotics investigations, bags cut in that fashion, as well as grinders and electronic scales, were consistent with the sale and distribution of narcotics. During the search, Miranda also told Drug Enforcement Administration ("DEA") special agent Louis Tenore that Pina Agee was the only one Miranda had bought drugs from. Miranda also stated that he had bought the 10 grams of

fentanyl from Pina Agee three days earlier.[1]

Defendant offers an alternative explanation for the physical evidence. He argues that the 10 grams of fentanyl, grinder, scales, and baggies, merely show that he was a careful user of drugs, preparing doses by weight for personal use. Def's Mem. 5 n.2 [#186]. Yet Fed. R. Crim. P. 29(a) requires consideration of the evidence in the best light for the government. A jury may weigh Defendant's narrative in a future retrial, but the court may not credit it on a motion for acquittal where a reasonable jury could find beyond a reasonable doubt that Miranda used these tools to prepare drugs for redistribution. In combination with Miranda's statement that he only bought drugs from Pina Agee, a jury could therefore reasonably find that Miranda redistributed Pina Agee's drugs.

B.     Miranda and Pina Agee's Relationship

Evidence from the calls and texts between Miranda and Pina Agee provide context further allowing a reasonable jury to find that Miranda was redistributing drugs he purchased from Pina Agee as part of the conspiracy *and* a reasonable inference that Pina Agee knew of Miranda's redistribution of those drugs. For example, in recorded calls on October 24, 2018, Miranda told Pina Agee that Miranda was with his "boy" and that the friend "just dealt for you a little bit just now. . ." Ex. 7. Pina Agee then asked Miranda if he had a "game boy," and Miranda's passenger confirmed he had a "scale." Id. Miranda and Pina Agee then agreed to meet up, and Miranda had his friend drop him off at Pina Agee's car. Id.; Ex. 8. From these recordings, a jury could reasonably infer Pina Agee knew Miranda and his "boy" were

---

[1] No evidence was offered at trial as to whether 10 grams of fentanyl is generally a "personal use" quantity, as Defendant contends, a quantity often used for redistribution as the government contends, or both. Miranda also told Agent Tenore that he used but did not sell the drugs. The jury was free to accept some of Miranda's statements to the officer and reject other statements.

distributing drugs on Pina Agee's behalf.

The recorded communications also allow for an inference of trust between Pina Agee and Miranda and an inference that Miranda was operating in coordination with Pina Agee, even though Miranda appears to have been, at most, a minor player in Pina Agee's enterprise. Miranda and Pina Agee communicated frequently while the wire taps were operational, especially between March 27 and April 25, 2019, when the government intercepted forty-four text messages and phone calls between them. While Defendant argues that these calls show that Miranda, as an addict, was desperate to see Pina Agee to get quick deliveries, Def's Mem. at 5 n.2 [#186], Pina Agee also sought out Miranda and expressed frustration when meetings didn't occur. See, e.g., Ex. 13 ("What's up with you you never hit me."); Exs. 18, 19 (arriving at Miranda's house 8 minutes after a text message from Miranda asking to see Pina Agee, even though Miranda was not yet home); Ex. 52 ("Yo come on I need to see you"). Miranda also knew not to discuss certain topics with Pina Agee over the phone, which a jury could infer meant that the pair had rules about communicating with each other. See, e.g., Ex. 12 (Miranda stating "I just I don't want to talk to you on the phone like that know what I mean? That's why I wanted to see you"). Further, the frequency of calls – and in-person meetings arranged on those calls – also support an inference that they were working together. For example, on April 2, 2019, the two communicated by phone eight times, including arranging a meeting at a bar at 6:59 p.m., Exs. 23, 24, 25, 26, 27, and then arranging a second meeting at 8:37 p.m. Exs. 28, 29.

Thus, it is reasonable for a jury to infer from these calls and meetings, including multiple communications on some days, that Miranda was more than simply Pina Agee's customer but was instead helping redistribute drugs for Pina Agee. See Symonevich, 688 F.3d at 23 (finding that evidence of buyer's repeat pattern of interaction with seller, buyer's knowledge of the

conspiracy's code, and evidence that buyer and seller had a relationship of "trust and familiarity" all supported a finding that buyer joined conspiracy). Accordingly, based on the "context for the relationship," the fentanyl and evidence of drug redistribution in Miranda's bedroom along with Miranda's statements during the search, and evidence that Pina Agee knew Miranda was redistributing his drugs, a reasonable jury could find beyond a reasonable doubt that Miranda knowingly and voluntarily joined Pina Agee's conspiracy to distribute drugs and to possess drugs with intent to distribute. Under Rule 29(a), this evidence requires the denial of Defendant's motion for acquittal.[2]

IV.     The Drug Weight Element

Defendant argues that even if Miranda joined the charged conspiracy, the government failed to present sufficient evidence so that a reasonable jury could find beyond a reasonable doubt that 40 grams or more of fentanyl was attributable to or reasonably foreseeable by Miranda. The court agrees.

As the drug weight element subjects Miranda to a mandatory minimum sentence on conviction, the government was required to prove the element beyond a reasonable doubt that. See Alleyne v. United States, 570 U.S. 99, 115-17 (2013); United States v. Pizarro, 772 F.3d 284, 292-93 (1st Cir. 2014). "[A] defendant cannot, simply by reason of his membership in a conspiracy that traffics in large amounts of drugs, automatically be 'saddled with the full weight of the conspiracy's wrongdoings.'" United States v. Dunston, 851 F.3d 91, 97 (1st Cir. 2017)

---

[2] Defendant's additional argument that the government "never observed or provided evidence that Mr. Miranda sold drugs to anyone" or "produced evidence that he had made such sales in the past" does not require a directed verdict. Def's Mem. 5 [#186]. While a jury may weigh whether the absence of evidence of sales is dispositive on the question of redistribution, the government provided other direct and circumstantial evidence upon which a jury could nonetheless find that Miranda joined the conspiracy to distribute drugs.

7

(quoting Sepulveda, 15 F.3d at 1197. The defendant instead "can only be held responsible for drugs that he 'personally handled or anticipated handling,' as well as 'drugs involved in additional acts that were reasonably foreseeable by him and were committed in furtherance of the conspiracy.'" Id. at 97-98 (quoting Sepulveda, 15 F.3d at 1197) (finding that quantity of crack cocaine was reasonably foreseeable to defendant who sold powder cocaine to codefendant, who then converted it).

To prove this element, the government relies in part on a phone call from Miranda to Pina Agee on April 24, 2019, where Miranda told Pina Agee that Miranda was with someone who "will do a whole for six-five" and "that's what I [Miranda] can . . . do for you [Pina Agee]." Ex. 56. Miranda asked Pina Agee to "fly to me right now man if you can." Id. Pina Agee responded, "I can't even do that right now" and that his number was "better than that [and] you know that." Id. Finally, Pina Agee replied, "I don't even know what ya . . . talking about man really" and, "I don't know how ya f*ckin. I'd rather just f*ck with you and you can f*ck with him . . . We can figure something out after that you already know one time." Id. The government also presented testimony that a "whole" is a common slang term for a kilogram and that the common street price for a kilogram of fentanyl was roughly $60,000 in the local area.

The government argues that this call allows a jury to infer that 1) Miranda and Pina Agee had previously discussed Pina Agee's price for a kilogram of fentanyl; and 2) Miranda (who, in other dealings, purchased drugs from Pina Agee for his own use or for redistribution according to the government), was now attempting to broker a sale of a kilogram of fentanyl from a third party to Pina Agee. Gov. Resp. to Mot. for Judgment of Acquittal 5 [#190].

Though Miranda may have hoped to "personally handle" such a big deal for Pina Agee, Sepulveda, 15 F.3d at 1197, there is no evidence that Miranda's proposal, rejected by Pina Agee,

came within the scope of any agreement with Pina Agee. Nor can a jury reasonably find that merely proposing such a deal that Pina Agee did not accept was an act "in furtherance" of the charged conspiracy. Id.

In determining that Miranda's rejected proposal falls outside of the scope of his alleged conspiracy with Pina Agee, the court takes guidance from the First Circuit's reasoning in cases considering whether defendants belonged to a single conspiracy or multiple separate conspiracies. In order to establish that a defendant belonged to a single conspiracy with other charged coconspirators, courts look for 1) a common goal; 2) interdependence of elements of the plan, or the "nature of the scheme"; and 3) overlap among participants. United States v. Soto-Beniquez, 356 F.3d 1, 18-19 (1st Cir. 2003); United States v. Portela, 167 F.3d 687, 695 n.2 (1st Cir. 1999). Interdependence exists "where the activities of one aspect of the scheme are necessary or advantageous to the success of another aspect of the scheme." United States v. Ortiz-Islas, 829 F.3d 19, 26 (1st Cir. 2016) (quoting United States v. Negron-Sostre, 790 F.3d 295, 309 (1st Cir. 2015)) (internal citation omitted).

Here, viewing the evidence in the light most favorable to the government, Miranda's attempt to broker a large deal with Pina Agee was not part of the "nature of the scheme" he allegedly entered into with Pina Agee – where Pina Agee was the central distributor and where Miranda was, at most, a small-time purchaser and redistributor. Nor was Miranda's idea "necessary or advantageous" to the charged conspiracy's success, even if it can be inferred that Miranda hoped it would be. Thus, as there is no evidence that Miranda's offer to broker a sale of fentanyl to Pina Agee was realistic or that the proposal can reasonably be construed as part of the same conspiracy, the court finds that no reasonable jury could infer, based on Exhibit 56, that the charged drug-weight was reasonably foreseeable to Miranda beyond a reasonable doubt.

Furthermore, Miranda's knowledge that Pina Agee trafficked in high quantities of drugs, including knowledge of Pina Agee's pricing for a kilogram of fentanyl, does not lead to a possible finding that the government proved beyond a reasonable doubt the drug-weight element. While the April 24 call, along with Miranda's statement to DEA Agent Tenore, presented at trial, that he knew people who sold kilograms of fentanyl, can sustain an inference that Miranda had knowledge that Pina Agee trafficked in large amounts of drugs, that knowledge without more cannot be used to saddle Miranda with the weight that Pina Agee trafficked in. See United States v. Colon-Solis, 354 F.3d 101, 103 (1st Cir. 2004) ("Where, as here, a defendant admits that the conspiracy to which he belonged handled drug quantities sufficient to trigger a mandatory minimum sentence, he becomes potentially eligible for the mandatory minimum - but that provision cannot be applied in his case without an individualized finding that the triggering amount was attributable to, or foreseeable by, him.").

Finally, the government also cites previously discussed evidence of the many meetings and transactions between Pina Agee and Miranda, and the interdependent nature of their relationship, in arguing that it can be inferred that Miranda obtained more than 40 grams of fentanyl during March and April 2019 from Pina Agee. Yet, apart from the 10 grams of fentanyl found in Miranda's jacket, the government did not provide any evidence of the quantity of drugs that Miranda purchased from Pina Agee. See United States v. Innamorati, 996 F.2d 456, 492 (1st Cir. 1993) (establishing drug-weight, in part, by adding up specifically quantified weights of purchases). Nor did the government provide any evidence quantifying amounts of fentanyl that Miranda redistributed, see Dunston, 851 F.3d at 99-100 (adding amount seized from defendant's person to amount that defendant sold to codefendant), or even evidence that Miranda primarily purchased or sold fentanyl, as opposed to one of the other drugs in the charged conspiracy.

Because the government provided mere speculation as to the amounts of fentanyl that Miranda "personally handled," "anticipated handling," or the amount of fentanyl "involved in additional acts that were reasonably foreseeable by" Miranda, "committed in furtherance of the conspiracy," no reasonable jury could find beyond a reasonable doubt that 40 grams or more of fentanyl was attributable to or reasonably foreseeable by Miranda. Thus, under Rule 29(a), the court must enter a partial directed verdict of acquittal.

V.    Conclusion

Accordingly, for the aforementioned reasons, the court GRANTS in part Defendant's motion for a directed verdict as to the drug weight element and DENIES Defendant's motion as to the underlying conspiracy charge. The court shall enter a partial judgment of acquittal.

IT IS SO ORDERED.

Date: May 11, 2020                                           /s/ Indira Talwani
                                                             United States District Judge